Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States in this honorable court. Thank you, Valerie, and welcome, everybody. This is Judge Newsom sitting this week with my colleague, Judge Branch, and we want to welcome a visiting colleague, Judge William Ray, Billy Ray, who is a federal district court judge on the Northern District of Georgia. Before that, Judge Ray was a judge with Judge Branch on the Georgia Court of Appeals. Before that, on the State Superior Court in Georgia, and before that, served in the Georgia State Senate. So, Judge Ray, thank you so much for being with us this week and helping us out with our work. We greatly appreciate it. Absolutely, thank you. All right, and to our attorneys, welcome to you as well. Sorry we can't be with you live and in person from Montgomery, but this will have to do. I think many of you have been before us in the past, but just wanted to give you a few ground rules. As you know, your time before us is limited, so we'll ask you that you skip the formalities and the factual recitations and the procedural histories and just proceed directly to the points of your case that you think are most salient. There's no lighting system, of course, on the telephone, but Valerie is on hand, our courtroom deputy, Valerie Geddes, is on hand to give you a two-minute warning. Just listen for her voice. She'll give you a two-minute warning, and then we'll also tell you when your time has expired. And at that point, we would just ask that you begin to wrap it up. I'm not going to cut you off in mid-sentence, but do please respect the time limits. All right, with that, we'll introduce the first case this morning. We have four cases on the docket this morning, the first of which is 19-11131, United States v. Guillermo Gonzalez Zeya, and we have here for Mr. Zeya, Mackenzie Lund, and for the United States, Brett Talley. So, Ms. Lund, you're going to start us off this morning, and I see that you have reserved two minutes for rebuttal. That's correct, your honor. Am I pronouncing your client's name correctly, Zeya? Yes, your honor, Gonzalez Zeya. Perfect. Thank you so much. Okay, good morning, your honors. Mackenzie Lund, appearing on behalf of the appellant, Mr. Guillermo Gonzalez Zeya. May it please the court. In this case, the warrantless detention of Mr. Gonzalez Zeya violated the Fourth Amendment because the ICE deportation officers lacked a particularized and objective basis for conducting the vehicle stop in September 2017. Moreover, even if the traffic stop was justified at its outset, the deportation officers unreasonably prolonged the stop in order to investigate unrelated criminal activity. Finally, Mr. Gonzalez Zeya's consent was the direct product of this illegal seizure, and the district court failed to hold the government to its burden of demonstrating that the consent was voluntary. So, to begin, reasonable suspicion for a Terry stop requires particularized and objective basis for suspecting the particular person stopped of criminal activity. And here, the deportation officers testified that Mr. Gonzalez Zeya did not commit any traffic offenses, they were not looking for him for any reason, and they had no suspicion of criminal activity that was unrelated to the fugitive Alfaro Aguilar. In fact, the only reason for this vehicle stop was the officer's hunch that the driver was, in fact, Alfaro Aguilar. But they observed... This is Judge Nussbaum. So, in fairness, was it more than a hunch? I mean, they had the social security number that was affiliated with the fugitive being used to set up a utility line at the home, so that's more than a hunch, right? Well, I mean, Your Honor, to be fair, yes. The basis for this hunch was the lead received from the ICE team in Atlanta. But when we're evaluating the totality of the circumstances, we have to look at this lead in the surrounding circumstances a little closer, and I think the lead is simply too stale and not detailed enough to supply reasonable suspicion to detain any male individual leaving this residence on suspicion of being Alfaro Aguilar. When they staked out this residence in September 2017, based on the social security number, this tip came from a clear report which revealed that the social security number in question was being shared by multiple individuals and, in fact, belonged to a Hawaiian individual unrelated to either of the two people at issue in this case. And then when Purdy generated his own report using this social security number as a search term, it pulled up 26 separate names with varying dates of birth. And this report also revealed that the social security number had been associated with this address from September 12, 2011 through January 10, 2017. So at the time of the vehicle stop in September 2017, it had been more than eight months since the last confirmed date that this social security number was associated with this address. And then, additionally, when Purdy went to verify the clear report by checking the EARM module report and the relevant immigration documents, he discovered that Mr. Alfaro Aguilar was ordered removed by an immigration judge in July 2016 because he did not show up for an immigration hearing in Houston, Texas. And at that hearing, Mr. Alfaro Aguilar's lawyer presented evidence that Mr. Alfaro Aguilar had departed the U.S. in July 2013. So I think, at best, all this information reveals is that an unknown individual using a shared social security number set up an unknown utilities connection at this residence in Heflin, Alabama, and that social security number had actually not even been associated with the address for eight months prior to the vehicle stop. So I think, based on this totality of the circumstances and what the officers were going off of, this amorphous lead does not provide the particularized and objective basis for stopping any male individual who left this residence on this date. So I think, Your Honor, effectively what the officers did is they showed up with the stated operation plan of stopping any vehicle that left this house. But, you know, even though they observed no physical characteristics that would have led them to believe this was Mr. Alfaro Aguilar, this is just not a particularized and objective reason to suspect the particular person stopped of criminal activity, and certainly not based solely on the fact that this shared social security number was used eight months previously to set up a utilities connection. Counsel, this is Lisa Branch. What about in United States v. Lewis, where we said, and I'm quoting, but as the Supreme Court has made crystal clear, individualized suspicion is not an absolute prerequisite for every constitutional search or seizure? Well, Your Honor, I think that's correct, but in determining reasonableness, the court must balance the governmental interest involved against the constitutionally protected interest of the private citizen. And this is not like in Brignani Ponce or Florida v. Royer, where it's, you know, near the border or at an airport, and there's a heightened governmental interest in preventing mass importation of drugs or securing border security. This is Heflin, Alabama, and a group of deportation officers are looking for a single individual who is subject to an administrative order of removal because he didn't show up to an immigration hearing. And we have an entire, we have three ICE agents showing up fully armed to stake out a residence at 5 a.m., and they seized the first individual to exit this residence without stopping to confirm whether this was in fact the person they were looking for. I mean, the governmental interest is simply not compelling enough to support the degree of the intrusion upon the constitutional rights of the individual, particularly given the high likelihood of infringement upon the Fourth Amendment rights of people totally uninvolved with Mr. Alfaro Aguilar. And, you know, I would like to proceed to the second issue and talk a little bit about the fact that these officers unreasonably prolonged the vehicle stop to conduct an unrelated criminal investigation. So a Supreme Court precedent on this point is really clear. The scope of a Terry stop must be carefully tailored to its underlying justification, and the stop may last no longer than is reasonably necessary to complete its mission. Let me ask you about that. This is Judge Ray. So, I mean, I think you agree that the question that was asked about who else was in the residence or who else may be in the residence was really merely seconds or just a minute or so after he was stopped. Is that correct? That's correct, Your Honor. And so how was a question, given that their purpose is to look for an individual who was a subject of a deportation order, who was known to have been associated with that Social Security member and was suspected of being at that residence, how is it prolonging the search to ask about the very thing that they're searching for? Your Honor, the key is this is not a voluntary encounter. This is a Fourth Amendment seizure. The officers cannot pull over and detain one person and then extend the stop for the purpose of investigating an immigration offense committed by someone else. But most of the cases that you cite and that we're familiar with are cases where they're asking about criminal behavior of the person that was stopped. And in this particular case, the questions didn't surround necessarily the person that was stopped once it was determined that he wasn't the guy. It was who's at your place? Is there anyone there that we need to know about? Again, Your Honor, the Fourth Amendment requires a particularized and objective basis for suspecting the particular person seized of criminal activity. Once it was clear that Mr. Gonzalez was not Mr. Alfaro Aguilar, authority for this seizure evaporated and they could not continue to prolong the stop in order to continue their investigation of Mr. Alfaro Aguilar. I mean, frankly... Counsel, this is Lisa Branch. What about the fact that I think it was about a minute into the encounter, your client had admitted that he was not in this country legally. If that's a separate crime, why wouldn't that authorize the officers to continue the stop? Your Honor, I mean, I think this stop was unreasonably prolonged at several different junctures, but you know... But a minute in, a minute in, he's admitted to a separate crime. Why isn't that enough to prolong the stop? Your Honor, we know from Rodriguez that a stop can become unreasonably prolonged even if conducted expeditiously, and even just a few seconds, as this court held in Campbell, can be the basis for concluding that the stop was unreasonably prolonged. So your argument is that it was unreasonably prolonged before he, within a minute, admitted that he was in the country illegally? Yes, your Honor. Specifically, my argument is the officers lacked reasonable suspicion for the initial vehicle stop, but even if not, it would have been immediately apparent to any reasonable officer as soon as he approached the car that this was not Alfaro Aguilar, and the stop was unreasonably prolonged when the officer asked for a name and ID. But even if it was okay to ask for a name and ID, it was a foray into investigating unrelated criminal activity to ask for a second form of ID. And then why he did not have an Alabama or a U.S.-issued ID? And even if at that point it was okay to ask Mr. Gonzalez-Sea why he did not have a specific form of ID, it was impermissible to ask if he lived alone and for consent to search his house. Like in Rodriguez, where the purpose of the stop was complete after the officer issued the traffic ticket, this stop was complete after they ascertained that Mr. Gonzalez-Sea, asking to go back to his home, was investigating an unrelated immigration offense committed by someone else. And again... Ms. Lund, let me... This is Judge Newsom. Just a quick question. So, I mean, it seems to me that there are several different questions that occurred during the scope of the stop. One, you know, I mean, one is just, you know, sort of, who are you? Two is, do you have any identification? And then four is, sort of, why don't you have an Alabama license? It seems to me that one, two, and three, at the very least, are just verifying that Gonzalez-Sea is who he says he is. What's problematic about that? Your Honor, it's problematic because any objectively reasonable officer would have immediately realized that this person was not the fugitive sought. The deportation officers had a photo and a physical description of Alfaro Aguilar right in front of them on their field worksheet. And these two men look nothing alike. They have drastically different skin tone and facial features. Mr. Gonzalez-Sea is a decade younger than Alfaro Aguilar. And perhaps most notably, Mr. Gonzalez-Sea has several very prominent physical deformities. He is missing four fingers on his right hand and one on his left, and he has mottled skin on both arms, none of which are noted in their description of Alfaro Aguilar. And it does not matter that this officer subjectively believed that, you know, he could not be sure this was not Alfaro Aguilar. You know, this officer testified that the only way he could be subjectively certain was to get fingerprints, which ironically, even that should have raised a major red flag because Mr. Gonzalez-Sea has half the usual number of fingerprints. The question is whether an objectively reasonable officer would have immediately recognized that this was not Alfaro Aguilar. And again, these two men look absolutely nothing alike, except for, broadly speaking, they're both Hispanic males. And so even the first question asking for any form of identification you say was a bridge too far. Yes, your honor, that's our position. But I think even if it was not a when he asked Mr. Gonzalez-Sea why he did not have an Alabama or U.S. issued ID, all of Mr. Gonzalez-Sea's answers up to that point served or reasonably should have served to dispel their suspicion that this was not Alfaro Aguilar. He provided his own name, not the name of the fugitive they were looking for. Then he produced a Mexican identification card with his own picture, name, and birthday, which again did not match the name, picture, age of the fugitive they were looking for. And this was a Mexican matriculate card, even though they were looking for a Honduran citizen. The only purpose for continuing to question Mr. Gonzalez-Sea regarding why he did not have a form of U.S. ID was to investigate an unrelated traffic offense, which they don't have the authority to do, or an unrelated immigration offense, which they do not have reasonable suspicion to support. And, Your Honor, I believe it looks like my time has expired. Okay, thanks so much. You have reserved two minutes for rebuttal. We'll hear from you after we hear from Mr. Talley. Thank you, Your Honor. Good morning, Your Honor. It's my pleasure to court Brett Talley on behalf of the United States. I just want to jump into this extended stop question because I do think this case represents an opportunity for the court to clarify the standard in Rodriguez and Campbell. It's true that questions cannot go beyond the mission of the stop. The Supreme Court's definition of mission in Rodriguez is quite broad. The mission, as the Supreme Court saw it, in that traffic stop case was not merely the narrow purpose of the stop. It wasn't just speeding or a blinker that doesn't work, but rather, quote, ensuring that vehicles on the road are operated safely and responsibly. And that's about as broadly as the court could define the mission of a traffic stop. And this court should hold the Supreme Court to its words and apply this broad mission-based theory outside the context of the traffic stop to investigative stops such as this one. So in the case at hand, the mission theory would permit ICE agents stopping an individual during an investigation into immigration violations to ask any questions related to that mission without violating the rule in Rodriguez. They could not ask questions about drug trafficking or money laundering or whether there are dead bodies in the car. Those questions would go beyond their mission, but they could ask the ordinary questions attendant to an immigration investigation, including questions about identity, status, and the like. The standard simplifies the test for courts and officers. And as long as officers' questions relate to their mission, this court need not microanalyze every question asked to determine whether or not it was sufficiently connected to the purpose of the stop. And that... So Mr. Talley, this is Judge Newsom. Just a quick question. So do you mean that mission extends beyond the person's stop? So in my sort of succession of questions that I was posing to Ms. Lund, questions one, who are you? Two, show us some ID. Three, show us another form of ID. And then four, I mean, at that point, it seems like they've probably figured out definitively that this is not Aguilar. And then the fourth question, well, why can't you give us another form of ID? At that point, that may be sort of immigration-related, but it's no longer Aguilar immigration-related. Well, I'll make a couple points on that. I think one, the broader question, can you ask questions to go beyond a specific person? I think you can. I think you could do that in a Terry stop before Rodriguez. I don't think Rodriguez changes that. Rodriguez did not rewrite what the mission is, right? It was not a sea change in what Terry stops are about. It was specifically about whether or not questions that went beyond that mission, if they were de minimis, if we could just sort of ignore that and move on. So I guess I would say it seems to me pretty clear from the case law that before Rodriguez, you could ask those questions. I think you can ask them after Rodriguez. Specifically to this case, though, and I'll just say this, specifically to this case, the moment they walked up to the car and saw this individual who was not Alfaro Aguilar, they arguably had reasonable suspicion of a different crime at that point, because they have a house where there is a social security number that has been stolen, that has been used to attach utilities. This was not just them stopping any person leaving that house. This is five o'clock in the morning. It's reasonable for the police to believe whoever leaves that house at five o'clock in the morning is not somebody who just stops by to borrow some sugar, right? That's the person who lives in that house. That's the person who attached that utility. So they have reasonable suspicion that this person has committed a crime, that there is a crime afoot. I do think, though, even putting that aside, I don't think there's any reason why the police, if they ask you who you are, they ask you for your identification, you have the Mexican driver's license that you give. The officer was very clear when he testified on the record that they see fake license all the time. Frankly, even if he had given them an Alabama driver's license, I think they could have continued asking questions because that could have been fake. They have the right to establish his identity. And that is a very old precedent. If it's a valid Terry stop, officers may identify the individual that they're stopping. So I guess I would say, both broadly speaking, yes, and in the narrow circumstances of this case, yes, they could ask those questions. One other thing I'm sorry, we just made me different. And maybe this runs really more to reasonable suspicion than to prolongation. But what is how would it have shaken out if the person who emerged from the house was white or black? Could they have pulled that person over? Well, I think I think that's an interesting question. On the one hand, obviously, and this is kind of a cop out when the circumstances are different, the circumstances are different. And we look at each case individually. That obviously would have been a big blow to the reasonable suspicion that this was Alfaro Aguilar from Guatemala. Now, they did not have that information, right? Question whether this person leaving that early in the morning from a house with a social security number that had been stolen, that had been used to attach a utility, whether they could have stopped that person anyways, because they reasonable suspicion that a crime was afoot. But for the narrow purpose of the immigration case, that would probably be a problem for me if I had them stopping a woman, or like you said, an individual who very clearly they could see was not this person. Now, that is not the circumstances here. They testified it was very dark. They were very, they're very early, they really could only tell that it was a man. One other thing I want to address on this Rodriguez and Campbell question, and this may be a loser from the start, but I think it's an interesting question whether the standard even applies here. As the appellant made very clear, this is not a traffic stop. This is a vehicle stop. This is a Terry stop. And while we analogize vehicle stops to Terry stops, it's not clear that the analogy goes the other way. And there are concerns that you have at a traffic stop that you probably don't have at a Terry stop. The biggest one is you have millions of regulatory stops happening every day for everything from a blinking taillight that's blinking too fast, like you had in Campbell, to speeding. And the Supreme Court, if you look at Rodriguez, was obviously very concerned that police were going to use those regulatory stops to launch a full scope investigation into things that they had no reasonable suspicion to even consider. When you have a Terry stop, you already have the reasonable suspicion that there is a crime afoot beyond that. So I think even at this point, even with Campbell, it's still an open question whether or not the Rodriguez, the sort of strict bright line rule about beyond the mission questions, even applies to a general Terry stop. I guess just briefly, I know this was not addressed in the first part, but as far as voluntariness goes, I think the record is very clear. This was not a hostile encounter between the police and Mr. Gonzalez. It was very cooperative, it was very cordial, no guns were drawn, nobody was handcuffed. And I think if you take a look at all of the various precedents that have come out of this court, when you look at those factors, it seems fairly clear that this was a voluntary encounter. If there are no other questions, I will cede back the remainder of my time. All right, very well. Or as our former Chief Judge Larry Edmondson used to say, when someone did that, splendid. Thank you very much, Your Honor. All right, Ms. Lund, you've got two minutes in rebuttal. Thank you, Your Honor. Just very briefly, I disagree pretty strongly that the officers had reasonable suspicion to inspect to investigate Mr. Gonzalez for an immigration offense the moment they walked up to this car. The reasonable suspicion here is tied specifically to the fact that they believe that this vehicle contains Alfaro Aguilar. Justification for this stop evaporated the moment it became clear that this was not Alfaro Aguilar. Requiring Mr. Gonzalez to answer numerous questions about his identification and why he did not have a specific type of identification prolonged the stop for the purpose of investigating an unrelated immigration or traffic offense. The only additional information that these officers learned during the encounter was that Mr. Gonzalez was, in fact, not Mr. Alfaro Aguilar, which was the only basis for the stop. And they also discovered that he was apparently of Mexican descent. But, I mean, we know from Brignani Ponce that an individual's apparent Mexican ancestry does not justify a reasonable belief that he is an alien nor a reasonable belief that he's concealing those who might be in the country illegally. And then, frankly, Your Honor, Rodriguez is very clear. You cannot prolong the stop to investigate unrelated criminal activity regardless of how expeditiously the unrelated inquiry is. Well, Counselor, this is Judge Ray. Do you agree with this concept that once they are aware or have probable cause to believe or at least reasonable suspicion that a different crime was committed than they were originally investigating, that that would give them the grounds to continue to detain, assuming that at the time that they discovered that additional information, that they had the right to be there at that time? So, in other words... Your Honor, my time's up, but I can attempt to answer. Yeah, go ahead. Right. So, I think if they had reasonable suspicion that... But these are deportation officers, so it would have to be reasonable suspicion of an immigration offense that Mr. Gonzalez-Zea had committed. But even then, that would preclude investigation into unrelated criminal activity as to an immigration offense committed by someone else. I believe my time is up, if there are no other questions. So, if I could just clarify just briefly, this is Judge Newsom. So, it sounds like the real sort of point of contention between you and Mr. Talley with respect to prolongation is that your contention is that reasonable suspicion and under Aguilar, and sort of once it's established that this is an Aguilar, the mission is at an end. And I took Mr. Talley to be saying that the mission is more broadly defined as sort of enforcement of the immigration laws. Your Honor, again, I think the difference is that we're saying the scope must be strictly tied to its underlying justification. And what Mr. Talley says might make sense in the context of a traffic stop, but here there's no reasonable suspicion to believe that Mr. Gonzalez-Zea committed a traffic offense, and the deportation officers do not have authority to enforce the traffic code. The only justification was to confirm or dispel their hunch that he was Alfaro Aguilar. And again, the immigration offense they're investigating here is tied specifically to Alfaro Aguilar. So, once they dispelled their suspicion that this was not Alfaro Aguilar, they could not continue to investigate unrelated offenses committed by Mr. Gonzalez-Zea unless they had independent freestanding reasonable suspicion to do so. And I think the record is devoid of anything that would support such a finding. Okay. Very well. Thank you so much, both Ms. Lund and Mr. Talley. You're both repeat players. You're always very good. Thank you so much for your argument. We'll submit that case.